# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>OLD BPSUSH, Inc., *et al.*<br><br>       Debtors. | Chapter 11<br><br>Case No. 16-12373 (BLS) |
| KARYN BARSA, JOAN DEA, C. MICHAEL JACOBI, MATTHEW MANNELLY, BERNARD MCDONEL, BOB NICHOLSON, MARK VENDETTI and JULIE ZALESKI,<br><br>       Plaintiffs,<br><br>       v.<br><br>THESEUS STRATEGY GROUP, LLC,<br><br>       Defendant. | Adv. Pro. No. 19-50726 (BLS)<br><br>Re: Docket Nos.  22, 24 |

Paul J. Lockwood, Esquire
Jason M. Liberi, Esquire
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Rodney Square
902 N. King Street
Wilmington, DE 19801

Robert A. Fumerton, Esquire
Lisa Laukitis, Esquire
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
Four Times Square
New York, NY 10036

*Counsel for Plaintiffs and Counterclaim Defendants Karyn Barsa, Joan Dea, C. Michael Jacobi, Matthew Mannelly, Bernard McDonnell, and Bob Nicholson*

Jeremy W. Ryan, Esquire
D. Ryan Slaugh, Esquire
POTTER ANDERSON & CORROON LLP
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19801

Christopher M. Paparella, Esquire
Nathaniel J. Kritzer, Esquire
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036

*Counsel for Plaintiffs and Counterclaim Defendants Mark Vendetti and Julie Zaleski*

Gavin McDaniel, Esquire
HOGAN McDANIEL
1311 Delaware Avenue
Wilmington, DE 19806

Robert J. Stark, Esquire
Andrew M. Carty, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

James W. Stoll, Esquire
Melanie Dahl Burke, Esquire
BROWN RUBNICK LLP
One Financial Center
Boston, MA  02111

*Counsel to Defendant and Counterclaim
Plaintiff Theseus Strategy Group LLC, in
its capacity as Litigation Representative
for Old PSG and the PSG Trust*

## **OPINION**[1]

This adversary proceeding arrived in the Court via an untraditional route.

Typically, when a confirmed plan creates a litigation trust, the trustee may pursue

litigation, often including claims against former officers and directors.  However, the

reverse happened here: the current adversary proceeding complaint was filed by

former officers and directors *against* the litigation trustee.  In the complaint, the

former officers and directors allege that the litigation trustee has threatened to sue

them,[2] even though they also allege that their asset preservation efforts were so

successful that they obtained "the best possible result for creditors, equity holders,

and employees alike."[3]  The former officers and directors argue that pursuit of this

litigation by the litigation trustee is a breach of the trustee's fiduciary duty to the

litigation trust and its beneficiaries, including equity security holders - - and at least

---

[1] This Court has jurisdiction to decide this Motion pursuant to 28 U.S.C. § 157 and § 1334(b). The Bankruptcy Court also has the power to enter an order on a motion to dismiss even if the matter is non-core or it has no authority to enter a final order on the merits.  *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.),* 2014 WL 1320145, *2 (Bankr. D. Del. Apr. 2, 2014) citing *In re Trinsum Grp., Inc.,* 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012) ("After *Stern v. Marshall,* the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has been reaffirmed . . . .").  Pursuant to Fed. R. Civ. P. 52 (made applicable here through Fed. R. Bankr. P. 7052) the Court does not make findings of fact for purposes of a decision on a Fed. R. Civ. P. 12(b) motion.

[2] Adv. D.I. 1 ¶¶ 2, 3.

[3] *Id.* ¶ 5.

one of the plaintiffs is an equity security holder and beneficiary of the litigation trust.[4] The officers and directors seek the following relief in the complaint: (i) monetary damages and disgorgement for the trustee's breach of the fiduciary duties of loyalty and good faith, (ii) a declaratory judgment that the plaintiffs have not breached their fiduciary duties, that the plaintiffs did not cause the company's bankruptcy filing, and that the plaintiffs are not liable for any damages caused by the bankruptcy, and (iii) a permanent injunction removing the litigation trustee.[5]

In response, the litigation trustee filed an answer and counterclaims, alleging that the officers and directors breached their fiduciary duties of good faith and loyalty, under Delaware law and British Columbia law, and for corporate waste.[6]

Before the Court for consideration are the (i) Officer Defendants' Motion to Dismiss Counterclaims,[7] and (ii) Director Defendants' Motion to Dismiss Theseus Strategy Groups LLC's Counterclaims with Prejudice (the "Motions to Dismiss").[8] The Trustee filed briefs in opposition to each Motion to Dismiss.[9] The Officers and Directors filed reply briefs[10] and the matter is fully briefed and ripe for consideration.

For the reasons that follow, the Motions to Dismiss will be GRANTED and all of the Counterclaims will be dismissed.

---

[4] *Id.* ¶ 8.

[5] *Id.* ¶ 10. The Trustee filed a separate motion for judgment on the pleadings regarding the Plaintiff's claims in the Complaint (Adv. D. I. 30), which will be decided separately.

[6] Adv. D.I. 18.

[7] Adv. D.I. 22 and 23.

[8] Adv. D.I. 24 and 25.

[9] Adv. D.I. 28 and 29.

[10] The Director Defendants' Reply Brief is Adv. D.I. 32, and the Appendix to the Director Defendants' Reply Brief is Adv. D.I. 33. The Officer Defendants' Reply Brief is Adv. D.I. 34.

I.    Background

On October 31, 2016, Performance Sports Group Ltd. ("PSG") and its wholly owned subsidiaries (the "Company" or the "Debtors") filed chapter 11 bankruptcy petitions in this Court.[11]    Prior to filing bankruptcy, the Company was a manufacturer of sporting goods equipment and apparel in the hockey, baseball, softball, lacrosse and soccer sporting segments.[12]    Pursuant to Bankruptcy Code § 1102, both a committee of unsecured creditors and a committee of holders of equity interests were appointed in this case (the "Committees").[13]

On February 28, 2017, the Debtors consummated a § 363 sale of substantially all of their assets.[14]    The Debtors' First Amended Joint Chapter 11 Plan of Liquidation of Old BPSUSH Inc. and it Affiliated Debtors (the "Plan") was confirmed on December 20, 2017.[15]    The Plan contained a "Global Settlement" of all issues and controversies between the Debtors and the Committees and provided for, among other things: (a) the payment in full of all Allowed General Unsecured Claims without post-petition interest (to the extent it would have been allowable); (b) the resolution of all disputes regarding the treatment of Intercompany Claims and Equity Interests;

---

[11] PSG was a British Columbia, Canada company with a principal place of business in Exeter, New Hampshire. The subsidiary Debtors include some United States corporations and some Canadian corporations.    Each of the Debtors also filed for protection from their creditors under Canada's *Companies' Creditors Arrangement Act* ("CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and the filing, the "Canadian Proceedings").

[12] The Trustee's Counterclaims, Adv. D.I. 18 (the "Counterclaims"), ¶ 33.

[13] D.I. 116, D.I. 202.

[14] Disclosure Statement with Respect to the First Amended Joint Chapter 11 Plan of Liquidation of Old BPSUSH, Inc. and its Affiliated Debtors (the "Disclosure Statement") (D.I. 1474), p. 35.

[15] Findings of Fact, Conclusions of Law and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation of Old BPSUSH Inc. and its Affiliated Debtors (D.I. 1566) (the "Confirmation Order") and the Plan (D.I. 1473).

(c) the resolution of all disputes regarding allocation of value among the Debtors and the allocation of the Sale Proceeds; and (d) the resolution of all disputes regarding substantive consolidation of the Debtors.[16] The Plan also appointed Theseus Strategy Group LLC ("Theseus" or the 'Trustee") to serve as Liquidation Trustee of the Old PSG Wind Down Liquidation Trust (the "Trust") and as Litigation Representative of the Trust and the Debtors.[17]

On October 23, 2019 - - over two and a half years following confirmation of the Plan - - former PSG officers (Mark Vendetti and Julie Zaleski, together the "Officers"), and independent directors (Karyn Barsa, Joan Dea, C. Michael Jacobi, Matthew Mannelly, Bernard McDonell, and Bob Nicholson, together, the "Directors") filed an adversary complaint against the Trustee for monetary, injunctive and declaratory relief in connection with "threatened" litigation by the Trustee against the Officers and Directors.[18]

On November 11, 2019, the Trustee filed its Answer and Counterclaims[19] in the adversary proceeding, asserting the following counterclaims:

1.  Breach of Fiduciary Duty of Care - Defendants Vendetti, as CFO of PSG and the PSG Subsidiaries, and Zaleski, as Controller and Treasurer of PSG and the PSG Subsidiaries.

---

[16] The Plan, p. 24.

[17] *See* the Confirmation Order, ¶¶ 14 – 22, and the Plan, §5.E.

[18] Adv. D.I. 1. The Plaintiffs assert four claims against the Trustee, seeking: (1) a declaratory judgment that they (a) did not breach their fiduciary duties to PSG or any of its affiliates, (b) did not cause PSG's bankruptcy, and (c) are not liable for damages caused by PSG's bankruptcy; (2) judgment against Theseus for breaching its duty of loyalty by using money that rightfully belongs to equity holders in order to threaten what it knows to be frivolous litigation against the Plaintiffs; (3) judgment against Theseus for breach of its duty of good faith by using money that rightfully belongs to equity holders in order to threaten what it knows to be frivolous litigation against Plaintiffs; and (4) a permanent injunction enjoining Theseus from pursuing its course of conduct and removing it as Liquidation Trustee. *Id.* at 114 – 30.

[19] Adv. D.I. 18.

2. Breach of Fiduciary Duty of Loyalty and Good Faith – Defendants Vendetti, as CFO of PSG and the PSG Subsidiaries, and Zaleski, as Controller and Treasurer of PSG and the PSG Subsidiaries.

3. Breach of Fiduciary Duty and Duty of Care – British Columbia Business Corporations Act Section 142 – Defendants Vendetti, as CFO of PSG, and Zaleski, as Controller and Treasurer of PSG.

4. Breach of Fiduciary Duty of Loyalty and Good Faith – Defendants Barsa, Dea, Jacobi, Mannelly, McDonell and Nicholson, as Directors of PSG, and with respect to Dea, Mannelly, and McDonell, as members of the Audit Committee.

5. Breach of Fiduciary Duty and Duty of Care – British Columbia Business Corporations Act Section 142 – Defendants Barsa, Dea, Jacobi, Mannelly, McDonell, and Nicholson, as Directors of PSG, and with respect to Dea, Mannelly, and McDonell, as members of the Audit Committee.

6. Corporate Waste – Defendants Barsa, Dea, Jacobi, Mannelly, McDonell, and Nicholson, as Directors of PSG and with respect to Dea, Mannelly, and McDonell, as members of the Audit Committee.

The Officers and Directors filed separate motions to dismiss the Counterclaims. The Trustee opposes the motions to dismiss and the matter is ripe for the Court's consideration.

II.    Counterclaims Factual Allegations

The Trustee's Counterclaims assert over 200 paragraphs of factual allegations, including the following:

A. *Company Background*

The Company began as a hockey-only company under the Bauer hockey brand.[20] Between 2012 and 2014, the Company engaged in a number of acquisitions of

---

[20] Counterclaims, ¶ 36. The Company was sold by Nike, Inc. in April 2008 to Kohlberg & Company, who took the Company public in Canada through an initial public offering on the Toronto Stock Exchange. *Id.*

sporting goods suppliers, including Combat Sports ("Combat") and Easton Baseball/Softball ("Easton"), both of which manufactured and sold baseball equipment for and to sports retailers.[21] The Trustee alleges that acquiring so many companies over a short period of time resulted in the Company's failure to integrate the various businesses into a seamless centralized business.[22]

The Company's internal sales policy included "standard-term contracts," which sold product to customers pursuant to written contracts that transferred the product's title to the customer upon delivery, and required payment in net 90 days or net 120 days, depending on the contract terms.[23] Any contracts with customers which deviated from those set forth in the standard-term contracts were referred to within the Company as "non-standard-term contract."[24] Two non-standard-term contracts include so-called "consignment" contracts and "guaranteed sale" or "right of return" contracts.[25]

The Company had two loan facilities (a revolver and a term loan), and, as of the bankruptcy filing, the Company's outstanding obligations under the loan facilities totaled approximately $490 million.[26]  The Company was required to provide its lenders with audited financial statements annually, within 90 days of the end of each fiscal year.[27]  A failure to timely provide these financials, if uncured, would result in

---

[21] *Id.* ¶ 37.

[22] *Id.* ¶¶ 44-48.

[23] *Id.* ¶ 41.

[24] *Id.* ¶42.

[25] *Id.* ¶ 43.

[26] Counterclaims ¶¶ 54-55.

[27] *Id.* ¶ 56.

an event of default under the loans.[28]  Because the Company was a publicly traded company, it also was required to file its annual report and audited financial statements with the Securities and Exchange Commission no later than August 15.[29]

### B. The Audit for FYE 2016

KPMG was, at all relevant times, the Company's auditor.[30]  Beginning in August 2015 and throughout FYE 2016, KPMG informed the Company that there was a significant deficiency in the Company's contract management practices and policies (the "Contract Management Significant Deficiency").[31]  At the close of the FYE 2015 Audit, KPMG specifically stated that a lack of communication between sales/operations personnel, who have the ability to enter into customer agreements, and finance personnel, who monitor the accounting consequences, had resulted in accounting errors and revenue reversals in fiscal years 2012, 2013, and 2014.[32]  The following day, KPMG informed the Audit Committee of the Contract Management Significant Deficiency.[33]  The Trustee claims that neither the Board, the Audit Committee, nor the Officers developed and implemented a remediation plan and

---

[28] *Id.* ¶¶ 56-57.

[29] *Id.* ¶ 58.

[30] *Id.* ¶ 19.  KPMG was obligated to conduct the Company's annual audit in accordance with Generally Accepted Auditing Standards ("GAAS"), the standards set forth by the PCAOB, and U.S. securities laws. *Id.* ¶ 60.  Section 10A(b) of the Securities Exchange Act of 1934 provides that an accountant who becomes aware of a possible "illegal act," which by definition includes making a materially false or misleading statement or omitting material facts from the accountant, must assure that the audit committee is "adequately informed" of the illegal act, unless it is "clearly inconsequential." *Id.* ¶¶ 61-62.  Additionally, if an auditor suspects that it has been misled, it must investigate whether any "illegal act" has occurred, determine if it materially affects the company's financial statements, and, if the company has failed to take remedial action, report it to the board. *Id.* ¶63.

[31] *Id.* ¶ 49-53.

[32] *Id.* ¶ 50.

[33] *Id.* ¶ 51.

instead permitted the decentralized contract control to continue throughout FYE 2016.[34]

Between May 2016 and August 2016 KPMG was engaged in its annual audit of PSG's books and records for FYE 2016.[35]  The Trustee alleges that KPMG had increased the risk assessment for the FYE 2016 Audit due to a series of adverse events that came to light beginning in December 2015 and extending through April 2016.[36]  These included allegations of improper sales practices, securities fraud lawsuits alleging concealment of such practices, and governmental investigations into those allegations.[37]  Notwithstanding these adverse events, the Counterclaims allege that the Officers interpreted the heightened testing by KPMG as suddenly hostile to management and its practices.[38]

The Trustee alleges that the Officers' mismanagement of the audit process culminated with certain non-standard-term contracts between Easton and Dunham's Sports ("Dunham's"), one of Easton's largest customers. [39]  In March 2016, Easton's Director of Finance notified Zaleski that Easton had improperly recognized $200,000 in previously booked revenue arising from an oral consignment (i.e., non-standard-term) contract, and Easton had used a manual journal entry to reverse the revenue.[40] Zaleski informed Vendetti of the oral consignment contract.[41]

---

[34] *Id.* ¶¶ 53, 100.
[35] *See generally* Counterclaims ¶¶ 64-82.
[36] *Id.*
[37] *Id.*
[38] *Id.* ¶¶ 76-81.
[39] *Id.* ¶¶ 83-171.
[40] Counterclaims ¶ 95.
[41] *Id.*

While reviewing the Company's financials in April 2016, KPMG asked Zaleski about the $200,000 manual journal entry and Zaleski disclosed the existence of Dunham's oral consignment contract.[42] The Trustee claims that Zaleski assured KPMG that the oral consignment agreement did not impact the reliability of Dunham's $2.2M overall receivable, which was otherwise based on standard-term contracts.[43] The Counterclaims assert that this representation turned out to be inaccurate because the Company's contract controls prevented Zaleski from gaining full knowledge of the contracts between Easton and Dunham's.[44] Zaleski would soon learn that approximately 20% of the remaining Dunham's receivable related to product shipped under another non-standard-term contract, known as the "Guaranteed Sale Contract."[45]

The Trustee alleges that in May 2016, the Officers (Zaleski and Vendetti) became aware of the Dunham's Guaranteed Sale Contract, which resulted in about $400,000 of improperly recognized revenue.[46] The Trustee further alleges that the Officers directed Easton's Finance Director to make a manual journal entry reversing the previously recognized revenue of $421,000, but the Officers did not inform KPMG of the existence of Dunham's Guaranteed Sale Contract or the corrective accounting entry in May or June 2016.[47] The Counterclaims assert that the Officers withheld

---

[42] *Id.* ¶ 96.
[43] *Id.*
[44] *Id.* ¶¶ 96-97.
[45] *Id.* ¶ 96.
[46] Counterclaims ¶¶ 101-102.
[47] *Id.*

the information based on their belief that the information was immaterial, and because they were concerned that KPMG would overreact or react negatively.[48]

The Trustee alleges that, eventually, circumstances involving another of the Company's business segments, Combat, resulted in the disclosure of the Dunham's Guaranteed Sales Contract, but not until the Officers had already made a number of misstatements that the Trustee alleges ultimately destroyed the faith in management that an auditor must have in order to rely on management's representations.[49] The Combat division was not included by KPMG in the audit since it represented less than 2% of the Company's revenues, but on June 20, 2016, upon learning of a potentially large return at Combat, Vendetti determined to conduct an internal audit of the Combat division.[50] When the internal audit was completed in mid-July, the Officers learned about the existence of four Combat customers with non-standard-term contracts (including one with Dunham's) in contravention of stated Company policy, which resulted in improper revenue recognition by the Company.[51] On July 26, 2016, Vendetti advised KPMG's lead audit partner, David Wilson ("Wilson"), of the results of the Combat internal audit and they agreed the issue of non-standard-term contracts at Combat should be brought to the attention of the Audit Committee at a meeting later that day.[52] The Counterclaims allege that

---

[48] *Id.* ¶¶ 77-82, 103.
[49] *Id.* ¶¶ 105-148.
[50] *Id.* ¶¶ 105-107, 109.
[51] *Id.* ¶¶ 110-112.
[52] Counterclaims ¶¶ 112-115.

the Officers did not inform KPMG or the Audit Committee of Dunham's Guaranteed Sale Contract with Easton at that time.[53]

On July 28, 2016, Vendetti met with Wilson and KPMG's internal forensic accounting expert to further discuss the Combat internal audit.[54] Wilson asked if Combat and Easton had any overlapping customers and, thus, whether there was a risk of similar non-standard-term contracts at Easton.[55] The Trustee alleges that Vendetti confirmed that there were overlapping customers between Combat and Easton, but that the two divisions operated entirely separately from one another (e.g. different employees, sales staffs), and there was no reason to believe anything that occurred between Combat and its customers could occur between Easton and its customers.[56] The Trustee claims that Vendetti did not disclose the existence of the Dunham's Guaranteed Sale Contract at Easton that had been discovered internally in May 2016.[57]

Following the July 28 meeting, KMPG requested additional information related to crossover customers and, in response, the Company provided KPMG with additional general ledger information regarding the manual journal entries, but with no specific explanation.[58] In an internal e-mail exchange on August 2, 2016, Vendetti informed the PSG accounting staff that failing to get KPMG all requested information that day risked the timely completion of the FYE 2016 Audit and would be a "disaster"

---

[53] *Id.* ¶¶ 116-118.
[54] *Id.* ¶132.
[55] *Id.* ¶ 134.
[56] *Id.* ¶ 135.
[57] *Id.* ¶ 136.
[58] Counterclaims ¶¶ 137-140.

for the Company.[59]   Upon reviewing the additional general ledger information, a KPMG Audit team member noticed a manual journal entry entitled "Dunham RTV [return to vendor]" and asked the Company's finance team about the June 22, 2016 manual journal entry and return.[60] The Counterclaims assert that, confronted with KPMG's inquiries, on August 4, 2016, the Officers disclosed the existence of Dunham's Guaranteed Sale Contract at Easton.[61]

Wilson informed Vendetti that Dunham's Guaranteed Sale Contract was a "significant issue" because "Easton [was] a much bigger operation than Combat" and because the vice president of sales at Easton was one of senior management responsible for signing representation letters that were submitted to KPMG on a quarterly basis.[62] At an emergency Audit Committee meeting on August 5, 2016, attended by Wilson and KPMG audit team members, Vendetti informed the Audit Committee of Dunham's Guaranteed Sale Contract at Easton and, for the first time in response to a direct question by an Audit Committee member, disclosed that he and Zaleski had been aware of the contract since May 2016.[63]  The Trustee alleges that the delay in disclosure concerned the KPMG audit team, but KPMG agreed that the Company's regular corporate counsel should secure affidavits from the Company's relevant management personnel assuring that no systemic problem existed.[64]

---

[59] *Id.* ¶ 144.
[60] *Id.* ¶ 141.
[61] *Id.* ¶¶ 148-149.
[62] *Id.* ¶ 150.
[63] *Id.* ¶¶ 151-153.
[64] Counterclaims ¶¶ 154 – 156.

On August 6, 2016, Wilson met with Vendetti and asked him why he had not disclosed the existence of the Dunham's contract earlier.[65]  The Trustee alleges that, according to Wilson, Vendetti expressly stated that although he (Vendetti) thought the contract was immaterial, he believed Wilson would blow it out of proportion.[66] The Trustee further alleges that this caused Wilson to believe that the Officers had not been honest with him and the rest of the KPMG audit team.[67]

### C. *The Board's Conduct and the Investigation*

Following an August 6, 2016 telephone conversation between Audit Committee members and KPMG, the Committee directed the Company's corporate counsel to prepare a written explanation of the Dunham's issue, and a work plan to provide KPMG with additional information to convince KPMG of the veracity of the Company's financial statements.[68]  Counsel prepared both documents on August 6 and 7, 2016.  The work plan outlined a series of actions to be completed by no later than August 11, 2016.[69]

However, at an Audit Committee meeting on August 8, 2016, KPMG refused to complete the audit or accept management representations without completion of an internal investigation by independent counsel into management integrity and sales practices.[70]  The Counterclaims assert that, although the Audit Committee initially argued that the Dunham's Guaranteed Sale Contract was an immaterial

---

[65] *Id.* ¶ 157.
[66] *Id.* ¶¶ 157- 159.
[67] *Id.* ¶¶ 160, 171.
[68] *Id.* ¶ 172.
[69] *Id.* ¶ 173.
[70] Counterclaims ¶¶ 174 – 176.

amount - - $400,000 in a company with over $500 million in annual revenues - - and that an independent investigation would delay timely completion of the Audit, the Audit Committee, and later the full Board, agreed to retain independent outside counsel to conduct the investigation.[71] The Audit Committee retained outside counsel (Richards Kibbe & Orbe LLP ("RKO")) on the recommendation of its Canadian corporate counsel, even though the Trustee alleges that RKO could not to commit to completing the investigation in a timeframe that would address KPMG's concerns, secure a completed audit, timely file the Company's annual report and audited financial statements, and allow the Company to remain in compliance with its secured loans.[72] On August 29, 2016, the Board secured a 60-day extension from its lenders (through October 29, 2016) to provide the Company's fiscal year 2016 annual report and consolidated audited financial statements.[73]

The Trustee alleges that, as of August 8, 2016, the Company's common stock was trading at approximately $3.40 per share, implying a market capitalization for the Company's stock of approximately $150,000,000.[74] On August 11, 2016, the day after the Board hired RKO to conduct the investigation, the Board approached the Company's largest shareholder, Sagard Capital Partners, L.P. ("Sagard") and asked if it would entertain taking the Company private.[75] The Counterclaims assert that Sagard indicated that it would "in a heartbeat."[76]    That same day, the Company

---

[71] *Id.* ¶¶ 175 – 177.
[72] *Id.* ¶ 181.
[73] *Id.* ¶ 187.
[74] *Id.* ¶ 179.
[75] *Id.* ¶ 182.
[76] *Id.*

retained Alvarez & Marsal North America LLC to assist the Company in preparing for a bankruptcy filing to facilitate such a transaction.[77]

On August 19, 2016, the Company retained an investment banker (Centerview Partners LLC) to market the Company's assets for sale and provide restructuring advice.[78]   On or about August 25, 2016, the Company considered slowing down or stopping RKO's investigation in light of the decision to file bankruptcy, but, the Trustee alleges, it did not end the investigation at the time because that would require public disclosure.[79]

By mid-September, the Company had reached agreement with Sagard who thereafter became the stalking horse bidder in the bankruptcy proceedings that followed.[80]

The Trustee further alleges that RKO's investigation efforts did not seriously begin until after the bankruptcy filing and the auction and sale of the Company's assets.[81]   For example, the Trustee claims that Vendetti and Zaleski were not interviewed until February 2017, after the Company filed bankruptcy, signed a stalking horse agreement, participated in  a § 363 auction process, and obtained a buyer of the Company's operating business.[82]   On or about March 27, 2017, RKO conveyed an oral report to the Audit Committee, attended by KPMG, summarizing the results and conclusions from its investigation to date, and announcing that no

---

[77] Counterclaims ¶ 183.
[78] *Id.* ¶ 185.
[79] *Id.* ¶ 186.
[80] *Id.* ¶¶ 185, 198.
[81] *Id.* ¶¶ 194 – 195.
[82] *Id.* ¶¶ 194 – 198.

further investigation would be conducted as the purpose was mooted by the sale.[83] KPMG resigned as the Company's auditor pursuant to a letter, dated March 27, 2017, that identified the reasons for withdrawal as: (i) potential illegal acts by the officers and directors, (ii) inadequate investigation by RKO, and (iii) failure to remediate issues raised by KPMG.[84]    The Trustee alleges that the investigation cost the Company over $6M and served no purpose.[85]

III.    <u>Standard- Motions to Dismiss</u>

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a short and plain statement showing that the pleader is entitled to some relief.[86] The pleading standard does not require detailed factual allegations, but it must be more than a defendant-unlawfully-harmed-me accusation.[87] When reviewing a motion to dismiss, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[88]   To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must show that the grounds of his entitlement to relief amount to more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.[89]

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[83] Counterclaims ¶¶ 199 – 200.
[84] *Id.* ¶ 201.
[85] *Id.* ¶ 193.
[86] *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).
[87] *Id.*
[88] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).
[89] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

alleged."[90] The plausibility standard is not akin to the probability standard but requires more than the sheer possibility that a defendant acted unlawfully.[91] Two principals underlie the *Twombly* standard. First, a court's acceptance of a complaint's allegations as true is inapplicable to legal conclusions, and threadbare recitals of cause of action elements, supported by conclusory statements, will not suffice.[92] Second, determining whether a complaint states a plausible cause of action requires the court to rely on its experience and common sense.[93] *Twombly* requires that a pleading nudge claims "across the line from conceivable to plausible."[94]

The Third Circuit follows a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[95]

The movant carries the burden of showing that the dismissal is appropriate.[96]

---

[90] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[91] *Id*. at 678.

[92] *Id*.

[93] *Id*.

[94] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

[95] *Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp*., 629 F.3d 121, 130 (3d Cir. 2010).

[96] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

IV.    <u>Summary of the Parties' Positions</u>

*A. The Officers' Motion to Dismiss*

The Officers assert that the Trustee's Counterclaims allege that the Officers failed to report a $421,000 accounting error to the Company's auditor which represented less than 0.5% of the Company's quarterly revenues and less than 0.1% of the Company's projected annual revenues. The Officers claim that the Trustee does not allege that the accounting error was material, that the Company financials were materially misstated or required restatement, that the Officers made false statements in a management representation letter or to KPMG, or that the Officers were self-interested. Accordingly, the Officers argue, the Trustee has failed to plead any facts suggesting that the Officers breached their duties of care or loyalty to the Company.

In response, the Trustee argues that the Officers breached their fiduciary duties by grossly and recklessly mismanaging the audit process fiscal year 2016, and thereby causing the outside auditor to believe that the Officers were intentionally concealing information. As a result, the auditor refused to complete the audit unless and until the company retained outside, independent counsel to investigate and assess the integrity of management. When the Company failed to complete the investigation in a timely manner, the auditor withdrew and the Company, although solvent and in compliance with its loan agreements, failed to timely file its annual reports and provide its lenders with audited financial statements as required under the loan agreements. Ultimately, the Company unnecessarily filed for bankruptcy

and sold its operating business in a § 363 sale, even though the Company at all times was solvent.

### B. *The Directors' Motion to Dismiss*

The Directors seek dismissal of the Trustee's Counterclaims arguing that the claims are an "effort to second-guess the discretionary business judgments made by a group of disinterested, independent directors as they fought to rescue their company from the brink of financial insolvency."[97]    The Directors assert that, when KPMG expressed concerns about how management accounted for certain contracts with two vendors, the Audit Committee promptly began an investigation.    When KPMG refused to certify the Company's financial statements and demanded an investigation, the Audit Committee and the Board launched "a comprehensive, multi-faceted inquiry" under the leadership of a respected, independent law firm.    The Directors claim that, while the investigation was pending, they took other actions, including securing an extension of deadlines in PSG's secured lending agreements, retaining investment bankers to explore strategic alternatives (including a potential sale of assets), and engaging an outside expert to advise on restructuring matters.

The Trustee argues in response that the basis of the Counterclaims against the Directors is that they abdicated their responsibilities to the Company by filing bankruptcy instead of timely completing the investigation demanded by the auditor as a condition to completing the Company's fiscal year 2016 audit. The Trustee claims that the Directors' conduct destroyed the Company's value.

---

[97] Directors' Opening Brief, Adv. D.I. 25, at 1.

## V.     Discussion

### A.     *The Officers' Motion to Dismiss*

#### 1.  *Breach of Fiduciary Duty of Care*

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) 'use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances;' and (2) 'consider all material information reasonably available.'"[98]  Further, "under Delaware law, a plaintiff cannot 'prove a breach of the duty of care without a showing of gross negligence.'"[99]  The Delaware Supreme Court has defined gross negligence as a "higher level of negligence representing an extreme departure from the ordinary standard of care."[100]  "To establish gross negligence, 'a plaintiff must plead ... that the defendant was 'recklessly uniformed' or acted 'outside the bounds of reason.'"[101]

The Officers argue that the Trustee's allegations show at most that they delayed in disclosing an immaterial error.[102]  The Officers reversed the error in the

---

[98] *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (quoting *In re The Walt Disney Company Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005). The fiduciary duties of officers of a Delaware corporation are the same as directors. *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

[99] *Liquidation Trust of Solutions Liquidation LLC v. Stienes (In re Solutions Liquidation LLC)*, 608 B.R. 384, 397–98 (Bankr. D. Del. 2019)(quoting *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders North America Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009)).

[100] *Solutions Liquidation*, 608 B.R. at 398 (quoting *A&J Capital, Inc. v. Law Office of Krug,* No. CV 2018-0240-JRS, 2019 WL 367176 at *12 (Del. Ch. Jan. 29, 2019), *judgment entered sub nom Capital, Inc. Law Office of Krug*, 2019 WL 499352 (Del. Ch. 2019) *aff'd* 222 A.3d 143 (Del. Nov. 1, 2019)).

[101] *Id.*

[102] The Officers rely on Delaware case law in which courts dismissed claims for breach of the fiduciary duty of disclosure for failure to allege material misstatements. *In re BJ's Wholesale Club, Inc. S'holders Litig.*, No. 6623, 2013 WL 396202, *13 (Del. Ch. Jan. 31, 2013) (Although a proxy statement inaccurately disclosed that no strategic buyers had expressed interest in the company, the court decided that there were no allegations that the misstatement was material or otherwise affected any shareholder's vote.  Further the court decided that subsequent truthful revision mitigates against a finding of bad faith.); *Kurz v. Holbrook*, 989 A.2d 140, 184 (Del. Ch. 2010) *rev'd in part on other*

Company's records as soon as they learned of it, and disclosed the overstatement to KPMG when KPMG requested specific information. The Officers argue that the allegations do not demonstrate gross negligence.

In response, the Trustee argues that the duty of care claim is based on gross and reckless mismanagement of the Audit process, not merely the Officers' failure to disclose the error. The Trustee claims that Vendetti and Zaleski failed to ensure that the Company's audit was timely and properly completed.   Knowing that KPMG was conducting a more thorough audit in FYE 2016 due to circumstances that beset the Company earlier that year (including allegations of improper sales practices, securities fraud lawsuits and regulatory investigations), the Trustee alleges that the Officers should have employed an attitude of heightened cooperation.  Instead, the Trustee claims that:

- When KPMG discovered the $200,000 manual journal entry related to Dunham's consignment contract in April 2016, the Officers then recklessly represented to KPMG that the remaining Dunham's receivable represented shipments made pursuant to standard-term contracts;

- When the Officers discovered Dunham's Guaranteed Sale Contract the next month, they failed to correct the earlier misrepresentation to KPMG;

- When discussing the internal audit of Combat, KPMG inquired about overlapping customers between Combat and Easton, but Vendetti once again failed to disclosure the Guaranteed Sale Contract.

---

*grounds* 992 A.2d 377 (Del. 2010) (denying a disclosure violation claim because disclosure of a contingent fee arrangement would not have "significantly altered the total mix of information."); *Pfeffer v. Redstone*, No. 2317, 2008 WL 308450, *8 (Del. Ch. Feb. 1, 2008) *aff'd* 965 A.2d 676 (Del. 2009) (dismissing a disclosure claim for failing to demonstrate materiality of the misstatements).

The Trustee argues that the Officers' internal steps to correct the revenue error do not absolve them from the impact of their repeated reckless misstatements to KPMG, which ultimately destroyed KPMG's trust in management and resulted in KPMG refusing to complete the FYE 2016 Audit in a timely manner.

In particular, the Trustee cites to two cases involving breach of duty of care claims against officers for reckless misstatements or conduct. In *Enivid*, a court decided that duty of care claims were adequately plead by describing the officers' irrational conduct when they intentionally remained silent and failed to disclose their knowledge of the CEO's inflated projections at board meetings at which certain disputed transactions and strategies were being considered.[103] Likewise, the court in *Miller v. U.S. Foodservice*, refused to dismiss claims against the company's former president/CEO/chairman arising from allegations that he knew about internal control problems, failed to implement corrective measures, and intentionally misrepresented during several audit committee meetings that stronger controls were being implemented.[104]

In response, the Officers contend that *Enivid* and *Miller* are not analogous to the present situation, as those cases involve egregious wrongdoing with respect to material issues. In *Enivid*, the officers misled the board on material issues by promoting, and voting in favor of, acquisitions based on falsified projections.[105]   In

---

[103] *In re Enivid, Inc.*, 345 B.R. 426, 452 (Bankr. D. Mass. 2006) (analyzing Delaware law).
[104] *Miller v. U.S. Foodservice, Inc.*, 361 F.Supp.2d 470, 479-80 (D. Md. 2005).
[105] *Enivid*, 345 B.R. at 451-52.

*Miller*, the CEO's misrepresentations resulted in an overstatement of earnings of $900 million.[106]

The Court concludes that the Officers' alleged misconduct does not come anywhere near the level of wrongdoing in *Enivid* or *Miller*. The allegations show that the Officers promptly corrected the revenue overstatements, which they plausibly believed were immaterial, in the Company's books and records and disclosed the information about non-standard-term contracts to KPMG and the Audit Committee when asked. The Trustee's factual allegations rest mainly conclusory accusations that the delay in disclosure destroyed trust and - - in short - - is not how prudent officers should handle an audit. However, the facts underlying the allegations do not demonstrate anything approaching an extreme departure from the ordinary standard of care. There are no allegations that the Officers were recklessly uninformed or that their handling of the audit fell outside the bounds of reason. There are no allegations of gross negligence and, therefore, the claim for a breach of the fiduciary duty of care against the Officers will be dismissed.

### 2. *Breach of Fiduciary Duty of Loyalty and Good Faith*

"Under Delaware Law, '[t]o state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs.'"[107] However, the duty of loyalty is "not limited to cases involving a financial or other cognizable fiduciary

---

[106] *Miller*, 361 F.Supp.2d at 481.
[107] *Solutions Liquidation*, 608 B.R. at 401 (quoting *Fedders*, 405 B.R. at 540).

conflict of interest."[108]  "It also encompasses cases where the fiduciary fails to act in good faith."[109]

"The duty to act in good faith is a 'subsidiary element of the duty of loyalty.'"[110] Claiming a failure to act in good faith must allege more than gross negligence.[111]   A lack of good faith is shown by alleging conduct motivated by a subjective bad intent, or conduct that is an "intentional dereliction of duty or the conscious disregard for one's responsibilities."[112] "The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith:

> First, it has held that such a failure may be shown where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation. Second, it has held that a failure may be proven where a director "acts with the intent to violate applicable positive law." Third, it has held that a failure may be shown where the director intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties...[T]here 'may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.'"[113]

In *McPadden*, the plaintiff alleged that the company's directors approved selling a subsidiary to a buyer led by the company's vice president, without soliciting offers from competitors and after relying on an investment banker's last minute presentation based on projections from the insider-buyer that were alleged to be

---

[108] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[109] *Id.*

[110] *Solutions Liquidation*, 608 B.R. at 401 (quoting *Fedders*, 405 B.R. at 540).

[111] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 65 (Del. 2006) ("[G]rossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith.")

[112] *McPadden*, 964 A.2d at 1274 (citing *Walt Disney Co. Derivative Litig.*, 906 A.2d at 66-68).

[113] *Id.* (quoting *Fedders*, 608 B.R. at 401, in turn, quoting *Walt Disney Co. Derivative Litig.,* 906 A.2d at 67).

"blatantly unreliable."[114] The Delaware Court of Chancery concluded that the directors' alleged conduct showed a reckless indifference to their duties by placing the officer-buyer in charge of the sale process and failing to ensure a thorough and complete process.[115] The *McPadden* Court decided the allegations supported claims of gross negligence,[116] but determined that the claims failed to allege bad faith through a conscious disregard of the duties.[117]

In *Ryan v. Gifford*, the Delaware Court of Chancery determined that a complaint adequately alleged conduct that was disloyal to the corporation (and, therefore, bad faith) when  claiming that the directors intentionally violated a shareholder approved stock option plan and fraudulently declared the directors' purported compliance with that plan.[118]

The Trustee argues that the allegations adequately assert that the Officers recklessly misrepresented the existence of the Dunham's Guaranteed Sales Contract to KPMG, then failed to correct those misrepresentations in a timely manner, causing KPMG to mistrust management and refuse to complete the audit without an independent investigation.  The Trustee asserts that these actions constitute bad faith because they fall within the "intentional dereliction of duty or the conscious disregard one's responsibilities."  The Court disagrees.  The allegations in the Counterclaims fail to state that the Officers intentionally disregarded their duties in

---

[114] *McPadden*, 964 A.2d at 1266-68.

[115] *Id.* at 1274-75.

[116] The *McPadden* directors, however, were protected from a breach of the duty of care claim by a § 102(b)(7) provision in the company's certificate of incorporation *McPadden*, 964 A.2d at 1273-75 (citing DEL. CODE ANN. tit. 8 § 102(b)(7)).

[117] *Id.* at 1275.

[118] *Ryan v. Gifford*, 918 A.2d 341, 358 (Del. Ch. 2007).

the face of a known duty to act or intended to harm the Company by acting with a purpose other than advancing the interests of the Company.  The Officers clearly and reasonably considered the Dunham's overstatement of revenue immaterial and, even assuming the truth of allegations that the Officers suspected KPMG would "blow it out of proportion," the allegations are not sufficient to support a claim that the Officers acted fraudulently or intended to thwart the audit process.  The allegations do not allege conduct that rises to the level of bad faith and, therefore, the claim against the Officers for breach of the fiduciary duty of loyalty and good faith must be dismissed.

### 3.  *Breach of Fiduciary Duty – British Columbia Law*

The Trustee asserts that corporate fiduciaries are held to higher standard of conduct under British Columbia law than under Delaware law and, therefore, the Counterclaims properly state a claim under British Columbia law.  The Officers dispute this.

"Section 122(1) of the CBCA [Canada Business Corporations Act] establishes two distinct duties to be discharged by directors and officers in managing, or supervising the management of, the corporation:

> (1) Every director and officer of a corporation in exercising their powers and discharging their duties shall:
>    a. act honestly and in good faith with a view to the best interests of the corporation; and
>    b. exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances."[119]

---

[119] *Peoples Dept. Stores Inc. v. Wise* [2004] 3 S.C.R. 461 ¶32.

The Supreme Court of Canada noted that the duty of loyalty described in Section 122(1)(a) requires "directors and officers to act honestly and in good faith with a view to the best interests of the corporation."[120]  The duty of care described in Section 122(1)(b) "imposes a legal obligation upon directors and officers to be diligent in supervising and managing the corporation's affairs."[121]

The Trustee argues that the statutory duty of care under the CBCA is more demanding than the common law standard which "required directors to avoid being grossly negligent with respect to the affairs of the corporation"[122] and notes that "[t]he emergence of stricter standards [under the CBCA] puts pressure on corporations to improve the quality of board decisions."[123]

However, the Supreme Court of Canada decided that the stricter standard which emerged under Section 122(1)(b) holds officers and directors to an *objective* standard of care, but still requires gross negligence.  "The common law  required directors to avoid being grossly negligent with respect to the affairs of the corporation *and judged them according to their own personal skills, knowledge, abilities and capacities*."[124]  The statutory standard of care now sets an objective standard, even though it includes the phrase "in comparable circumstances," and this standard "makes it clear that the factual aspects of the circumstances surrounding the actions of the director or officer are important in the case of the s. 122(1)(b) duty of care, as

---

[120] *Id.*
[121] *Id.*
[122] *Id.* ¶ 59.
[123] *Id.* ¶ 64.
[124] *Id.* ¶ 59 (emphasis added).

opposed to the subjective motivation of the director or officer . . . ." [125]    The Canadian

Court also wrote:

> The establishment of good corporate governance rules should be a shield
> that protects directors from allegations that they have breached their
> duty of care.  However, even with good corporate governance rules,
> directors' decisions can still be open to criticism from outsiders.
> Canadian courts, like their counterparts in the United States, the
> United Kingdom, Australia and New Zealand, have tended to take an
> approach with respect to the enforcement of the duty of care that
> respects the fact that directors and officers often have business expertise
> that courts do not.  Many decisions made in the course of business,
> although ultimately unsuccessful, are reasonable and defensible at the
> time they are made.  Business decisions must sometimes be made, with
> high stakes and under considerable time pressure, in circumstances in
> which detailed information is not available.  It might be tempting for
> some to see unsuccessful business decisions as unreasonable or
> imprudent in light of information that becomes available *ex post facto*.
> ***Because of this risk of hindsight bias, Canadian courts have
> developed a rule of deference to business decisions called the
> "business judgment rule", adopting the American name for the
> rule.***[126]

Based on the foregoing, the Court cannot agree that British Columbia holds

officers and directors to a higher standard that no longer requires a showing of gross

negligence.[127]  This Count will be dismissed.

---

[125] *Peoples Dept. Stores Inc.,* 3 S.C.R. 461  ¶ 63.

[126] *Id.* ¶ 64 (emphasis added). Under Delaware law, the business judgment rule "presumes
that 'in making a business decision[,] the directors of a corporation acted on an informed basis, in
good faith, and in the honest belief that the action taken was in the best interests of the company.'"
*Solutions Liquidation*, 608 B.R. at 402 (quoting *In re Walt Disney Co. Derivative Litigation*, 906 A.2d
27, 52 (Del. 2006)).  "Those presumptions can be rebutted if the plaintiff shows that the directors
breached their fiduciary duty of care or loyalty or acted in bad faith."  *Id.*   As discussed earlier, the
Trustee's factual allegations do not rise to the level of gross negligence or bad faith needed to plead
around the business judgment rule.

[127] Even assuming, arguendo, that British Columbia law imposes a higher standard, the
allegations of the Counterclaims are insufficient to survive even the standard suggested by the
Trustee.

(B)    *The Directors' Motion to Dismiss*

    1. *Breach of Fiduciary Duty of Loyalty and Good Faith*

The Trustee argues that the Counterclaims' allegations, taken as a whole, support a claim that the Directors breached the fiduciary duty of loyalty and good faith, particularly the Board's failure to follow through on the investigation required by KPMG, and the decision to immediately pivot to bankruptcy and a sale of the Company's assets when the Company was solvent.  The Trustee asserts that these allegations demonstrate the Directors' bad faith through an "abdication of their responsibilities"[128] or a "faithlessness or lack of true devotion to the interests of the corporation and its shareholders."[129]

The Directors argue in response that the factual allegations in the Counterclaims, when stripped of hyperbole and conjecture, fail entirely to show a Board that abdicated its responsibilities.  Instead, when KPMG raised concerns about the Dunham's contract, the Board directed corporate counsel to prepare a work plan to address those concerns.[130]  When KPMG refused to complete the Audit without an investigation by outside counsel, the Board promptly engaged outside counsel and obtained a 60-day extension from the secured lender to provide consolidated audited financial statements.[131]  At the same time, the Board sought the guidance of experts to examine strategic alternatives by hiring outside advisors in disciplines ranging

---

[128] *Bridgeport*, 388 B.R. at 559; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993), *decision modified on reargument,* 636 A.2d 956 (Del. 1994)

[129] *Bridgeport*, 388 B.R. at 564.

[130] Counterclaims ¶ 172.

[131] *Id.* ¶¶ 176 - 177, 181, 187.

from law to investment banking to restructuring.[132]  On October 31, 2016, the Company filed bankruptcy and entered into a "stalking horse" asset purchase agreement, which was approved by and completed under the supervision of both the Delaware Bankruptcy Court and the Canadian Court.[133]

These actions are easily distinguished from those taken by the directors in *Bridgeport*, a case relied on by the Trustee, in which the directors abdicated their decision-making authority to a new chief operating officer who, without any supervision by the Board, negotiated an asset sale without hiring investment bankers to "shop" the deal, or conducting a thorough search for potential strategic buyers.[134] The Trustee's allegations are also distinguished from the facts in *Dux Capital*, in which the court determined that there was sufficient evidence to support a jury's conclusion that the company's directors pursued bankruptcy so the directors could squeeze out the minority shareholders' interests, without any professional's recommendations and without considering alternatives that might yield some value to the corporation.[135]

"A claim for bad faith is not stated by second-guessing the Board's actions."[136] There is no reasonable inference in the Trustee's allegations that the Directors abdicated their responsibilities, acted in an uninformed manner, or acted against the Company's interests.  Even considering the asserted facts in the light most favorable

---

[132] *Id.* ¶¶ 181 - 183, 185.

[133] *Id.* ¶¶ 198 - 199.  A transaction that admittedly paid all secured and unsecured creditors in full.

[134] *Bridgeport*, 388 B.R. at 556.

[135] *Dux Capital Mgmt. v. Chen*, 2004 WL 1936309, *10, *13 (N.D. Ca. Aug. 31, 2004).

[136] *In re AgFeed USA, LLC*, 558 B.R. 116, 127 (Bankr. D. Del. 2016) (citing *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009)).

to the Trustee, there is no alleged behavior that rises to the level of bad faith needed to support a claim against the Directors for breach of the fiduciary duty of loyalty and good faith.  This Count will be dismissed.

### 2. *Breach of Fiduciary Duty of Care – British Columbia law*

The Trustee contends that the Counterclaims allegations assert a valid claim against the Directors for breach of the duty of care because it asserts that the Directors placed a solvent and robust company into bankruptcy and sold off its assets at a great loss of value, rather than comply with the auditor's request for an investigation. The Court rejects the Trustee's arguments for two reasons.  First, as discussed in Part V.A.3. above, the duty of care standard under British Columbia law, similar to Delaware law, requires a showing a gross negligence based on an objective standard.   Second, as discussed in the preceding section, when again stripped of hyperbole and conjecture, the Trustee's factual allegations show that the Directors commenced the investigation requested by the auditors and, at the same time, sought advice on strategic alternatives for the Company from a number of experienced outside professionals.   The Trustee's allegations do not assert that the Directors' behavior was recklessly uninformed or that they acted outside the bounds of reason.[137] Because there are no allegations of actions based on gross negligence, this Count will be dismissed.

---

[137] *In re Solutions Liquidation LLC,* 608 B.R. 384, 398 (Bankr. D. Del. 2019) (citations omitted).

### 3. *Corporate Waste*

The crux of the Trustee's corporate waste claim is that the RKO investigation, which cost the Company over $6 million, was futile because the Directors decided immediately to put the Company on the path to bankruptcy for the purpose of selling the assets.

"Under Delaware law, a corporate waste claim must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation."[138] "Stated slightly differently, 'if, under the facts pled in the complaint, any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'"[139]

The Directors argue that the factual allegations do not support a corporate waste claim.  First, the Directors argue that the allegations demonstrate that the investigation was necessary. The Trustee alleges that on August 8, 2016, KPMG informed the Audit Committee that it would not complete the FYE 2016 Audit without the completion of an investigation conducted by independent outside counsel.[140]  Although the Audit Committee initially argued that the Dunham's contract was immaterial, KPMG refused to alter its stance, so the Audit Committee

---

[138] *Off'l Comm of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders North America, Inc.)*, 405 BR 527, 549 (Bankr. D. Del. 2009) (quoting *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 893 (Del. Ch. 1999) (internal quotation marks omitted)).

[139] *Id.*

[140] Counterclaims ¶ 174.

agreed to hire independent outside counsel.[141]  The allegations therefore show that the investigation was necessary.

Second, the Directors disagree that the investigation was wasteful just because the Board simultaneously explored an asset sale or bankruptcy.[142]  The Directors also point out that there were legitimate grounds for continuing the investigation while planning for different contingencies - - as a practical matter, it would have been difficult to attract third-party bidders if the Board could not represent that it was conducting a credible investigation into the circumstances surrounding KPMG's concerns.

Third, the Directors assert that the factual allegations mix in various conclusory statements that are not entitled to the assumption of truth.[143]  For example, the Trustee alleges that the Board never intended to complete the investigation[144] or that the Board and Audit Committee ignored their fiduciary duties to the Company and immediately "threw in the towel" and determined to file for bankruptcy relief.[145]  The Trustee's claim cannot rely on the conclusory statements.

The Court agrees with the Directors. Those factual allegations that should be considered in the light most favorable to the Trustee do not demonstrate corporate waste.  Those allegations fail to show that the economics of the investigation were so

---

[141] *Id.* ¶ 175.

[142] On August 11, 2016, the Company asked its largest shareholder whether it was interested in "taking the Company private." *Id.* ¶ 182.  About this same time, the Company engaged other professionals, including bankruptcy counsel and an investment banker. *Id.* ¶¶ 183, 185.

[143] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

[144] Counterclaims ¶ 192.

[145] Counterclaims ¶ 181.

flawed that no disinterested person of right mind and ordinary business judgment could think the investigation beneficial to the corporation.   This Count will be dismissed.

VI.    <u>Conclusion</u>

For the reasons discussed above, the Officers' Motion to Dismiss and the Directors' Motion to Dismiss will be granted.   An appropriate Order follows.

BY THE COURT:

Dated:  June 30, 2020

Brendan Linehan Shannon
United States Bankruptcy Judge